IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JULIO C. GUERRERO, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 15-CV-05064 |
| WEXFORD HEALTH SOURCES, INC. et al. | ) ) ) ) | Judge John J. Tharp, Jr. |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Julio Guerrero, an inmate at Stateville Correctional Center, brings claims against a variety of prison employees (and Wexford Health Sources, which provides healthcare services at the prison, and several Wexford employees) for deliberate indifference to his foot deformity and resulting pain. The named employees of the Illinois Department of Corrections ("IDOC") – Shanal Barnett, Michael Lemke, Dorretta O'Brien, Royce Brown-Reed, Salvador Godinez, and David Gomez – have moved to dismiss the counts against them under Fed. R. Civ. P. 12(b)(6). For the reasons stated below, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

For the purposes of this motion, all factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1996). The Court summarizes only the facts that are relevant for the IDOC defendants' motion, and thus does not recite much of the medical information and grievances that are relevant to the healthcare defendants.

Julio Guerrero has had a genetic deformity in his feet since childhood, which causes him to have "flat feet" with no arches and collapsed insteps. Am. Compl. ("Compl.") ¶ 14, ECF No. 31. This condition causes him "extreme pain in his feet, knees, and lower back, rendering it

difficult for him to walk or to perform any kind of physical activity" without custom orthotic shoes. *Id*. Guerrero had such shoes growing up, and he had such shoes in prison until June of 2012, when the shoes were lost in his transfer between prisons. *Id*. at ¶ 14-15. Beginning in late 2012, Guerrero tried to convince medical staff at Stateville to prescribe him custom orthotic shoes but struggled to even get appointments to see medical staff. *See id.* at ¶ 17-24.

The IDOC defendants first enter the picture on October 14, 2013, when a grievance officer denied one of Guerrero's requests for shoes and to see the doctor because according to Royce Brown-Reed (the Healthcare Unit Administrator) the medical staff had told Guerrero to purchase shoes from the commissary and he had done so. *See* Compl. Ex. E. Brown-Reed determined a referral to the Medical Director (the only doctor on staff) was not necessary. *Id*. Guerrero's grievance had specifically explained that the commissary shoes did not have the arch support he needed to alleviate his symptoms. *See* Compl. Ex. D. Warden Michael Lemke checked the "I concur" box on this grievance denial. *See* Compl. ¶ 26.

The bulk of Guerrero's claims against the IDOC defendants stem from an October 29, 2013 cell house round performed by Lemke, Brown-Reed,[1] and Assistant Warden Dorretta O'Brien. *See* Compl. ¶ 28. During the rounds, Guerrero approached these defendants and explained that he needed an appointment with the Medical Director to receive treatment for his flat feet. *See id.* at ¶ 29. He further explained that Wexford was failing to provide him with a remedy, an appointment with the Medical Director, or an appointment with an orthopedist. *Id*. Guerrero showed Lemke and O'Brien his shoes, which showed "balding on the insides of the shoes and Plaintiff's collapsed arches touching the ground." *Id*. Finally, he explained his pain

---

[1] Brown-Reed is occasionally referred to in the complaint as "Braun-Reed." The Court uses "Brown-Reed," which is how the defendant is identified in the caption and briefing.

levels, to which Lemke and O'Brien responded "Wow, that's bad!" *Id*. They wrote Guerrero's name on a list and said they would look into it.

At some point, O'Brien told Guerrero to speak with Brown-Reed directly, which he did. *See* Compl. ¶ 30. Guerrero also showed Brown-Reed his inadequate shoes and explained his pain. *Id*. At some point (it is unclear whether it was before or after the other conversations), Brown-Reed told O'Brien that Guerrero's problems were not covered by IDOC healthcare. *Id*.

Later on October 29, Guerrero wrote a letter to Salvador Godinez, the Director of IDOC, summarizing the October 29, 2013 cell house round interactions and pleading with him to provide Guerrero with the medical care he sought. Compl. ¶ 30. It is not clear what, if any, response Guerrero received.

In June 2014, Guerrero was finally allowed to see the Medical Director, and was granted over the counter insoles for his shoes, which he alleges did not assist with his problems. *See id.* at ¶ 33-34. On July 23, 2014, he fell while playing basketball (as a result of the ill-fitting insoles) and injured his ankle. *See id.* at ¶ 35-36. Guerrero was treated by Shanal Barnett, a medical technician, over the course of three visits. *See id.* at ¶ 36. During these visits, Barnett prescribed pain medication and monitored his condition, but did not determine the cause of his injury beyond the fall. *Id*. It does not appear that Guerrero ever discussed the insoles or his foot problem with Barnett.

Guerrero continued through this period to file grievances and otherwise contest his inability to receive treatment by an orthopedist. On April 29, 2015, Deputy IDOC Director David Gomez was approached by Guerrero during cell house rounds. Compl. ¶ 42. In Spanish,[2]

---

[2] Guerrero's primary language appears to be Spanish, and throughout his complaint there are references to Guerrero requiring the assistance of other inmates to communicate in written English. *See, e.g.,* Compl. ¶ 45.

3

Guerrero explained that his pain was worsening and that he was not being treated. *Id*. He showed Gomez the balding shoes and that his arches touched the ground. *Id*. Gomez asked whether he had exhausted the grievance process, and when Guerrero confirmed that he had, Gomez wrote down Guerrero's name and number and said "I'll see what I can do, but I can't promise you anything." *Id*. Gomez also told Guerrero "I know what I would do," which Guerrero alleges suggested litigation as a remedy. *Id*.

## DISCUSSION

This motion moves to dismiss Count II, which is against only Lemke, O'Brien, Godinez, and Gomez and only in their official capacities, and Count III, which is against all the IDOC and medical defendants in their individual capacities.[3] *See* Mot. at 2, ECF No. 65. Count II requests only injunctive relief, while Count III requests damages. The IDOC defendants argue that Count II should be dismissed because "the named Defendants are no longer situated in a capacity with Stateville or the IDOC to ensure that the injunctive relief would be carried out." *Id*. They request Count III be dismissed because "Plaintiff fails to allege that the IDOC Defendants were personally involved in the alleged deprivation of rights, nor can it be inferred that Defendants' [sic] had the requisite knowledge." *Id*. For the reasons stated below, the motion to dismiss is denied as to every defendant except Barnett (for all counts) and Gomez and O'Brien as to Count II only.

### I. Injunctive Relief (Count II)

Defendants Lemke, Godinez, Gomez, and O'Brien argue they should be dismissed from Count II because only Gomez is still employed with IDOC, and he is now assigned to another facility. *See* Def.'s Mem. at 5-6. Further, they argue the Assistant Warden and Deputy Director

---

[3] The IDOC defendants also request to be dismissed from Count I, which is explicitly brought only against Wexford. The Court therefore denies that request as moot.

4

lack "ultimate authority" over medical decisions, and therefore are not proper parties to this request for injunctive relief. *Id.* at 6. As to the second point, the request for injunctive relief is broader than a mere request that Guerrero be sent to an orthopedist (although that is certainly part of it). Count II requests an injunction that would also provide "a reasonable and timely process for cancelling, skipping, and/or rescheduling appointments" and "an option for E.S.L. [English-as-a-Second-Language] inmates to write grievances in Spanish, as well as to translate grievance responses from English into Spanish." *See* Compl. Relief ¶ 1. But there is no basis to infer a need for injunctive relief operating on subsidiary employees of the state facility; any injunction issued that requires action by the facility would of necessity be issued as to the Warden and, perhaps, the IDOC, which would have the responsibility for ensuring the institution's, or Department's, compliance with the injunction. There is no need or reason to include subsidiary employees as defendants to a claim that seeks a remedy against the institution.

As to the propriety of the parties now that they have left employment at Stateville, district court practice seems to be split between substituting the individuals that currently hold the respective positions as soon as the change is known and waiting until any injunction issues. *Compare Johnson v. Randle*, No. 10-CV-0135-MJR-SCW, 2012 WL 1964996, at *16 (S.D. Ill. May 31, 2012) (substituting current IDOC Director) *with Echezarreta v. Kemmeren*, No. 10 C 50092, 2013 WL 4080293, at *4 (N.D. Ill. Aug. 13, 2013) (issue of whether injunctive defendants still work at prison can be addressed through summary judgment) and *Foster v. Ghosh*, 4 F. Supp. 3d 974, 984 (N.D. Ill. 2013) (substituting upon grant of injunction). Dismissal of a count requesting injunctive relief is not, and has not been construed by courts in this district to be, appropriate merely because a different person in that official capacity would have to carry out any granted injunction. This Court reads the Seventh Circuit's decision in *Gonzalez v.*

5

*Feinerman* to suggest that immediately substituting the current employees serving in those official capacities is the appropriate response to personnel changes. *See Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (substituting current warden). Thus, the motion to dismiss Count II is granted as to defendants Gomez and O'Brien, denied as to defendants Lemke and Godinez, and Randy Pfister and John Baldwin are substituted for Lemke and Godinez, respectively, as to Count II as they now hold those positions.

## II. Damages Relief (Count III)

A plaintiff states an Eighth Amendment claim when he has alleged prison officials displayed "deliberate indifference to [his] serious medical needs." *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005). This requires a demonstration of an objectively, sufficiently serious medical condition as well as a "sufficiently culpable state of mind" such that the official knew of and disregarded an "excessive risk to inmate health." *Id*. at 653. At the motion to dismiss stage "[k]nowledge and intent, in particular, need not be covered in detail" and merely alerting the appropriate personnel responsible for an issue and having them do nothing is sufficient to state a claim at the motion to dismiss stage. *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). A non-medical staff member, however, cannot be held liable for fulfilling their job responsibilities and referring the matter to medical personnel. *Id.* at 595 (no requirement that prison employees act as "ombudsmen" to resolve any problem that comes to their attention regardless of whether it is within their realm of responsibility); *see also, e.g., Greeno,* 414 F.3d at 656. With these principles in mind, the Court addresses individually whether each defendant has had sufficiently plausible personal involvement and state of mind.[4]

---

[4] The defendants do not contest that Guerrero's condition, which he has alleged causes severe pain and restrictions on physical activity, is an objectively serious medical condition at this stage.

### A. Barnett

Barnett is the medical technician who assessed and treated Guerrero's ankle injury. *See* Compl. ¶ 36. The brunt of Guerrero's complaint is that Barnett never determined the "larger cause" of his fall (presumably that he did not have the correct orthopedic shoes). *Id*. Nowhere does Guerrero allege, however, that Barnett was in any way aware of his "flat feet" condition or that he required treatment for that problem. Nowhere in the "Offender Injury Report" attached to the complaint or the "Offender Outpatient Progress Notes" attached to the complaint are Guerrero's flat feet or requests for orthopedics mentioned. *See* Compl. Ex. L, M. In order to have violated Guerrero's Eighth Amendment rights, Barnett must have known facts that would allow her to "know of and disregard an excessive risk to inmate health." *Greeno*, 414 F.3d at 653. Here, Barnett is not alleged to have known of anything more than that Guerrero injured his ankle playing basketball, and she treated that injury. Guerrero suggests it is unbelievable that "given Mr. Guerrero's medical history and previous visits to the HCU" Barnett would not have been aware of Guerrero's problem. *See* Pl.'s Resp. at 12. The complaint, however, does not allege Barnett had ever previously treated Guerrero or that she consulted his previous records while treating his ankle injury. Moreover, the context in which she encountered Guerrero—treating him for an ankle injury incurred during a basketball game—gave her no reason to suspect that Guerrero had a debilitating foot condition; to the contrary, the fact that Guerrero was playing basketball creates reason to question just how serious his foot condition was. Therefore, Guerrero has not alleged that Barnett had sufficient knowledge to state a claim against her personally. The motion to dismiss is granted as to Barnett.

### B. Lemke

Defendant Lemke was the warden at Stateville, who concurred in the denial of Guerrero's August 7, 2013 grievance regarding his lack of medical care. Compl. ¶ 26. He also was approached by Guerrero during the October 29, 2013 cell house rounds, when Guerrero explained he needed care, was not receiving it, and Lemke wrote down Guerrero's name and said he would look into it. *Id.* at ¶ 28-29. It does not appear, however, that Guerrero received any follow up from Lemke and he did not see a doctor until June 4, 2014, more than five months later. *See id.* at ¶ 33. IDOC contends Lemke cannot be liable because he was entitled to defer to the judgment of healthcare professionals. *See* Def.'s Mem. at 9. However, in order to rely on the judgment of medical professionals Lemke would have to have actually consulted with medical professionals or forwarded Guerrero's case for their consideration. *See Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (defendant not liable when he "consulted with the medical staff, forwarded Berry's concerns to the DOC, and timely responded to Berry's complaints"). At this stage, the complaint alleges that Lemke was made aware that Guerrero was in serious pain and not receiving any treatment, and Lemke said he would act but appears not to have done so. To the extent the defendants wish to contest those sparse facts, summary judgment is the appropriate time to demonstrate that Lemke either lacked knowledge or did in fact rely on medical personnel. The motion to dismiss is denied as to Lemke.

### C. O'Brien

The allegations against O'Brien are almost identical to those of Lemke, other than that she allegedly told Guerrero to speak with Brown-Reed at some point. *See* Compl. ¶ 30. The Court is unclear when O'Brien referred Guerrero to Brown-Reed – whether it was before the October 29 cell rounds or during that conversation. *Id*. Confusingly, Guerrero also alleges that

8

O'Brien told him that Brown-Reed did not consider his complaints to be healthcare-related. *See* Compl. Ex. F. As discussed above, O'Brien was entitled to rely on other employee's medical expertise if she investigated and relied on their knowledge. *See Greeno,* 414 F.3d at 657. A supervisor, however, may not turn a blind eye to a subordinate's refusal to provide medical treatment. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Drawing the inferences in favor of the plaintiff, the complaint states that not only did O'Brien fail to follow up after she became aware of plaintiff's needs and lack of treatment on October 29, but she was aware that IDOC was refusing to treat plaintiff because his needs were not considered medical by Brown-Reed. If true, such actions would state a claim for deliberate indifference to Guerrero's serious medical needs. Construing all inferences in favor of the plaintiff, the motion to dismiss is denied as to O'Brien.

### D. Brown-Reed

Brown-Reed is the Healthcare Unit Administrator at Stateville. Compl. ¶ 11. The Court is unclear as to whether Brown-Reed has any medical training or is merely an administrator. Brown-Reed was evidently consulted by a grievance officer regarding Guerrero's August 7 grievance, when she advised that "a referral to see [the] Medical Director is not deemed necessary." *Id.* at ¶ 26. Brown-Reed was also present during the October 29 cell house rounds, and at some point Guerrero explained his pain and his situation. *Id*. at ¶ 28, 30. At some point, Brown-Reed allegedly told O'Brien that Guerrero's complaints were not "covered by healthcare." *Id*. at ¶ 30. Again, Brown-Reed is entitled to rely on medical judgments, but only if she actually contacts medical personnel or reviews medical records. Here, Brown-Reed allegedly told O'Brien that Guerrero's issues were not covered by her department (and thus, presumably, were not medical issues at all). One reasonable inference from her statement is that Brown-Reed

9

did not refer Guerrero's issues to medical personnel or otherwise rely on medical expertise. Of course, it might also imply Brown-Reed did consult with doctors who indicated Guerrero lacked a medical issue. At this stage, the Court must make inferences in the plaintiff's favor. Therefore, the motion to dismiss is denied as to Brown-Reed because she had been made aware of Guerrero's problems during the cell house round and declined to act on them in any way.

### E. Gomez

Gomez is the Deputy Director of IDOC. Compl. ¶ 13. On April 29, 2015, Guerrero approached Gomez during cell house rounds and explained his condition and that he was not receiving adequate care. *Id*. at ¶ 42. After Guerrero confirmed he had exhausted his grievances, Gomez wrote down Guerrero's name and number and said he would "see what I can do." *Id*. Gomez allegedly also hinted that Guerrero should pursue litigation. *Id*. This interaction provided Gomez with sufficient personal knowledge to know that Guerrero had a problem and that Gomez should consult with doctors or otherwise forward Guerrero's concerns to the medical department. However, Guerrero appears to have received no information suggesting Gomez took any action. At this stage, the failure to take any action after being aware of a prisoner's lack of medical care causing a painful condition is sufficient to state a claim. Therefore, the motion to dismiss is denied as to Gomez.

### F. Godinez

At the time of this lawsuit, Godinez was the Director of IDOC. Compl. ¶ 12. The only interaction Guerrero is alleged to have had with Godinez is that Guerrero mailed him a letter regarding his lack of treatment.[5] *Id*. at ¶ 30. The letter, attached the complaint, is addressed

---

[5] At one point in describing Guerrero's interaction with Gomez, the complaint says "Plaintiff shared with Mr. Godinez that he was still experiencing pain." *See* Compl. ¶ 42. In

10

simply to "Director" and is stamped with "inmate issues Nov. 6 2013." *See* Compl. Ex. F. IDOC in its reply claims that the fact Guerrero received his requested relief in June 2014 (a visit with the Medical Director) suggests Godinez did not act with deliberate indifference. *See* Def.'s Reply at 8, ECF No. 72. That five month delay, with no other evidence that Godinez is the reason Guerrero was seen, is insufficient to suggest Godinez investigated or responded to Guerrero's letter. Guerrero was pursing many grievances and clearly making his complaints known to many different people. Furthermore, although it is quite possible that Godinez may not have received the letter that is merely addressed to "Director," it appears to have been received by some official because it has a receipt stamp. Several courts have allowed allegations such as the failure to respond to letters regarding a lack of care to move past the motion to dismiss stage, because (when taking the allegations of the complaint as true) Godinez would have had sufficient knowledge to require him to act in some way (at least to show that the complaint had been referred to an appropriate staff member for follow up) if he had read and received the letter. *See Wilder v. Wexford Health Sources, Inc.,* No. 11 C 4109, 2015 WL 2208440, at *12 (N.D. Ill. May 8, 2015) (collecting cases). Although the Court is skeptical that factually the letter was received and read by Godinez himself and that Godinez in fact did nothing, such issues are factual ones for summary judgment. Therefore, the motion to dismiss is denied as to Godinez.

Because the injunctive relief count can properly be brought against whoever is currently acting in the official capacities formerly held by the named defendants and there are plausible, if minimal, allegations that all the defendants except Barnett had sufficient knowledge of Guerrero's lack of treatment, the motion to dismiss is denied except as to Barnett and as to defendants Gomez and O'Brien in regards to Count II. The motion is granted as to Barnett, who

---

context, the Court construes this as a typo and that the individual Guerrero spoke with was Gomez and not Godinez.

is dismissed from this case with prejudice. The motion is also granted as to defendants Gomez and O'Brien as to Count II only; they remain defendants as to Count III. Randy Pfister and John Baldwin are substituted for Lemke and Godinez, respectively, as to Count II as they currently serve as the warden of Stateville and the Director of the IDOC.

*     *     *

Dated: July 25, 2017

John J. Tharp, Jr.
United States District Judge