# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JULIO C. GUERRERO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 C 5064 |
| | ) | |
| WEXFORD HEALTH SOURCES, | ) | Judge John J. Tharp, Jr. |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff in this case, Julio Guerrero, is incarcerated at Stateville Correctional Facility

in Crest Hill, Illinois. While incarcerated, Mr. Guerrero has experienced medical issues stemming

from structural abnormalities in his feet: his feet lack arches, a condition commonly known as "flat

feet," and his insteps collapse inwards. Mr. Guerrero brings this case under 42 U.S.C. § 1983

against numerous defendants associated with Stateville for failure to properly respond to his

medical issues in violation of the Eighth Amendment. First, Mr. Guerrero alleges an

unconstitutional policy, custom, or practice on the part of Wexford Health Sources, Inc.

(Wexford), the vendor under contract to provide medical care for Illinois Department of

Corrections (IDOC). Second, Mr. Guerrero names certain IDOC employees in their official

capacities, alleging that IDOC carried out Wexford's unconstitutional policy. Finally, Mr.

Guerrero alleges deliberate indifference to his medical needs on the part of various IDOC and

Wexford employees.[1] Both the IDOC and the Wexford defendants have filed motions for summary

---

[1] Mr. Guerrero concedes that both Dr. Obaisi, Wexford's Medical Director at Stateville,
and Mr. Godinez, Director of IDOC, should be dismissed with prejudice. Mr. Godinez's dismissal
is discussed *infra* note 6 and Dr. Obaisi's dismissal is discussed *infra* note 15.

judgment. Because the undisputed record shows that the defendants did not violate the Eighth Amendment in addressing Mr. Guerrero's foot condition, the defendants' motions for summary judgment are granted.

## BACKGROUND

Since childhood, Mr. Guerrero has struggled with structural abnormalities in his feet—his feet lack arches and his insteps collapse inwards. Pl.'s Counter-Statement of Facts to Wexford Defendants ("PSOF Wexford") ¶ 1, ECF No. 138. At some point before July 2005, Mr. Guerrero purchased, on the recommendation of a doctor, non-prescription orthotic insoles and shoes that provided him with additional support. *Id.* ¶ 2. Nevertheless, Mr. Guerrero has "always had pain" in his feet, which he treated exclusively with over-the-counter pain medications like Aleve. Guerrero Dep. 42:11, 23:12-16, ECF No. 127-2; Wexford Defendants' Statement of Facts ("Wexford DSOF") ¶ 8, ECF No. 132. When he was first incarcerated in July 2005, the Cook County Department of Corrections confiscated Mr. Guerrero's orthotic insoles and shoes and issued him standard footwear. *Id.* ¶ 1. Later, while at Menard Correctional Center, a fellow inmate gave Mr. Guerrero a pair of orthotics, but these were lost during Mr. Guerrero's transfer to Lawrence Correctional Center in June 2012. Am. Compl. ¶ 15, ECF No. 31.[2]

Mr. Guerrero was transferred to Stateville on August 6, 2012. PSOF Wexford ¶ 10. After about three months at Stateville, Mr. Guerrero sought out medical care for his feet. On November

---

[2] Mr. Guerrero testified in his deposition that a nurse at Menard had provided the orthotics. Guerrero Dep. 40:22, ECF No. 127-2. His statement in the amended complaint indicating that he obtained the orthotics from another inmate, however, cannot be controverted by his deposition testimony. "A judicial admission trumps evidence." *Murrey v. United States*, 73 F.3d 1448, 1455 (7th Cir. 1996); *see also, e.g.*, *Crest Hill Land Development LLC v. City of Joliet*, 396 F.3d 801, 805 (7th Cir. 2005) (statement in answer constituted biding judicial admission that was conclusive for purposes of summary judgment). Further, P.A. Williams found no record of Guerrero receiving insoles at Menard when she checked his medical file. Williams Dep. 84:20–85:8, ECF No. 132-2.

21, 2012, he saw a Certified Medical Technician, complaining of pain in his ankles. Pl.'s Counter-Statement of Facts to IDOC Defendants ("PSOF IDOC") ¶ 7, ECF No. 136. From there, Mr. Guerrero was referred to see a physician on December 5, 2012, but he did not attend this appointment.[3] Wexford DSOF ¶ 12. After another appointment was rescheduled—this time for a reason unrelated to Mr. Guerrero's attendance—he saw Physician's Assistant LaTanya Williams on February 1, 2013. PSOF Wexford ¶¶ 11-12. At this appointment, Williams diagnosed Mr. Guerrero with flat feet and obesity and ordered an x-ray of his feet and ankles. Wexford DSOF ¶ 14. Williams scheduled a follow-up for late February and instructed Mr. Guerrero to lose weight and purchase shoes with good support and/or insoles from the commissary. *Id.* On February 27, Mr. Guerrero returned for his follow-up: the x-rays were normal and Mr. Guerrero, who had not purchased shoes, had no additional complaints. *Id.* ¶ 15. Williams reiterated her recommendations and told Mr. Guerrero to return to the Healthcare Unit (HCU) as needed. *Id.* A few months later, in August 2013, Mr. Guerrero visited the commissary and purchased a pair of Nike shoes. *Id.* ¶ 18. Guerrero testified that the shoes, though lacking a high or firm arch, helped his condition. Guerrero Dep. 40:2-4, ECF No. 127-2.

Although P.A. Williams instructed Guerrero to return as needed, and a daily sick call was conducted at Stateville, Wexford DSOF ¶ 16, Mr. Guerrero did not return to the HCU to address any problem associated with his feet for well over a year after his February 27, 2013 consultation with P.A. Williams.[4] Guerrero did receive treatment for other issues during these months, but he did not take the opportunity to lodge any complaints of foot pain or any other pain attributable to his flat feet. For example, when he was seen by an LPN in June 2013 after involvement in an

---

[3] The record does not explain why Mr. Guerrero was not present for this appointment.

[4] Guerrero testified that he didn't go to the HCU because "they never called me." Guerrero Dep. 56:11, ECF No. 127-2.

altercation, Mr. Guerrero complained of a swollen nose but had no other complaints. Wexford DSOF ¶ 17; Wexford DSOF Ex. 5 at 41, ECF No. 132-5.

Mr. Guerrero did, however, raise concerns to IDOC about his need for help with his foot pain during this period. On August 7, 2013, the day after he purchased shoes from the commissary, Guerrero filed a grievance with IDOC stating that the commissary shoes did not alleviate his pain and requesting "orthopedic boots, shoes and insoles." PSOF IDOC ¶ 13. After discussing Mr. Guerrero's treatment by Wexford with defendant Royce Brown-Reed, the Health Care Unit Administrator (HCUA) at Stateville, an IDOC grievance officer recommended that no action be taken on the grievance because he had received adequate care and had not sought further treatment since February. IDOC Defendants' Statement of Facts ("IDOC DSOF") ¶ 26, ECF No. 127. The office of defendant Warden Michael Lemke concurred with the recommendation and denied Guerrero's grievance on October 21, 2013.[5] Id. ¶ 27.

About a week later, on October 29, 2013, Guerrero spoke with defendants Lemke, Brown-Reed, and Assistant Warden of Programs Doretta O'Brien about his medical treatment while they were performing cell-house rounds. PSOF IDOC ¶ 16. Later that day, Mr. Guerrero sent a letter to the office of defendant Salvador Godinez, the director of IDOC. Id. ¶ 22.[6] The letter recounted his conversation that day, stated that he was in constant pain due to inadequate medical care, and

---

[5] The parties dispute Warden Lemke's personal involvement in the denial of the grievance. See IDOC DSOF ¶ 27 ("Defendant Lemke's designee concurred with the Grievance Officer's recommendation."); See Pl.'s Resp. IDOC DSOF ¶ 27, ECF No. 136 ("The October 21, 2013 response bears Defendant Lemke's signature, suggesting he reviewed and signed the grievance. Mr. Guerrero does not dispute Defendant Lemke denied reviewing the grievance at his deposition, despite it bearing his signature.").

[6] Salvador Godinez is named as a defendant in the amended complaint, but Mr. Guerrero concedes in his Response brief that his claim against Godinez should be dismissed with prejudice. See Pl.'s Resp. Br. at 3 n.1. Accordingly, Guerrero's claim against Godinez is not addressed in this opinion and a judgment in Godinez's favor will be entered.

requested that Godinez intervene. *Id.* Mr. Guerrero also sent a letter[7] to O'Brien and O'Brien's office[8] responded on December 6, 2013. IDOC DSOF ¶ 29. The response stated that "an x-ray was taken and the results showed no indication for orthopedic shoes," and also noted that Guerrero had purchased shoes from the commissary per Williams' recommendation. IDOC DSOF Ex. 9, ECF No. 127-9.

Mr. Guerrero filed a second grievance on December 13, 2013, again complaining about the lack of medical care for his flat feet. PSOF IDOC ¶ 25. This grievance received the same response as the first: on May 15, 2014, a grievance officer reviewed Mr. Guerrero's grievance and, after conferring with an LPN who advised that "[t]here is no medical reason at this time for special arch supports," recommended "[n]o action," citing Guerrero's receipt of medical care. IDOC DSOF ¶¶ 31-32. On December 1, 2014, Godinez's office concurred with this recommendation and denied the grievance. *See* Pl.'s Resp. IDOC DSOF ¶ 33.

On June 4, 2014, roughly 16 months after his appointment with P.A. Williams, Mr. Guerrero saw Dr. Obaisi, the Medical Director for Wexford, about his flat feet. Wexford DSOF ¶ 21. Dr. Obaisi evaluated Mr. Guerrero and ordered a pair of arch support insoles to help with his condition. *Id.* ¶¶ 21-22. Mr. Guerrero received the arch supports on July 18, 2014. *Id.* ¶ 24. Five

---

[7] The parties dispute which letter elicited a response from O'Brien's office, but Mr. Guerrero's position is unsupported by evidence: the letter cited by Mr. Guerrero is dated June 8, 2014. As the IDOC defendants correctly note, "Plaintiff's Exhibit 10 consists of a letter written by Defendant O'Brien's office dated December 6, 2013, and a letter written by Plaintiff to [O'Brien] dated June 8, 2014. The letter from Defendant O'Brien's office cannot be a response to Plaintiff's letter as stated in Additional Material Fact No. 23." Defs.' Resp. PSOF IDOC ¶ 23, ECF No. 141.

[8] The parties dispute O'Brien's personal involvement in drafting the letter. *See* IDOC DSOF ¶ 30 ("Defendant O'Brien was not personally involved in drafting the December 6, 2013, letter."); Pl.'s Resp. IDOC DSOF ¶ 27 ("The December 6, 2013 letter bears Defendant O'Brien's signature and letterhead, suggesting she was personally involved in Mr. Guerrero's care. Mr. Guerrero does not dispute Defendant O'Brien denied reviewing and signing this form at her deposition.").

days later, he twisted his ankle while playing basketball with the insoles in his shoes. *Id.* ¶ 25.[9] On

August 8, 2014, Mr. Guerrero filed his third grievance stating, among other things, that "[n]o one

assessed the proper fit of [his] insoles" and "[n]o orthopedic evaluation was ever scheduled." PSOF

Wexford ¶ 25. A grievance officer reviewed the grievance on October 22, 2014 and recommended

no action, citing Guerrero's ongoing receipt of medical care by multiple medical providers. IDOC

DSOF ¶ 32. On December 1, 2014, defendant Godinez's office concurred with the

recommendation and denied the grievance. *See* Pl.'s Resp. IDOC DSOF ¶ 33.

Following treatment for his sprained ankle in July 2014, Mr. Guerrero did not seek any

other assistance from the HCU—at least not in the manner required—for more than two years.[10]

In March 2015, however, roughly nine months after seeing Dr. Obaisi, Mr. Guerrero wrote a letter

to Wexford requesting "intervention and approval for orthopedic evaluation." PSOF Wexford ¶ 31.

Wexford replied with a form letter advising Mr. Guerrero to "follow the established sick call

process and grievance procedure." *Id.* ¶ 32. Next, on April 29, 2015, Mr. Guerrero spoke with

defendant David Gomez, the Deputy Director for the Northern District of IDOC, about his flat feet

while Gomez was making his cell-house rounds. Def.'s Resp. PSOF IDOC ¶ 31.[11] A month later,

---

[9] The evidence establishes that Mr. Guerrero was able to play basketball at other times while at Stateville. Although Mr. Guerrero disputes the IDOC defendants' contention that he was able to play basketball while incarcerated, Pl.'s Resp. IDOC DSOF ¶ 19, Mr. Guerrero only disputes in part the Wexford defendants' similar assertion. *See* Pl.'s Resp. Wexford DSOF ¶ 19 ("Undisputed insofar as Paragraph 11 does not imply Mr. Guerrero was able to play basketball without pain."). Because Mr. Guerrero's deposition establishes that he played basketball, at least on occasion, his objection to the IDOC defendants' statement is not well-taken. *See* Guerrero Dep. 84:24–85:6, ECF No. 127-2.

[10] Mr. Guerrero maintains that over the years he made repeated informal requests to medical staff for treatment. PSOF IDOC ¶ 40.

[11] The IDOC defendants, for their part, dispute this occurrence, but it is documented in the May 29, 2015 grievance form Guerrero submitted and in any event Guerrero, as the nonmovant, is entitled to have fact disputes resolved in his favor.

on May 29, 2015, Mr. Guerrero filed another grievance—his fourth—stating that he spoke with Gomez about his feet and requesting orthopedic shoes and inserts. IDOC DSOF ¶ 35; PSOF IDOC ¶ 32. A grievance officer reviewed Mr. Guerrero's grievance and found that no action was required: the response instructed Mr. Guerrero to follow the established sick call procedures. IDOC DSOF Ex. 8 at 16, ECF No. 127-8. Shortly thereafter, on June 9, 2015, Mr. Guerrero filed this lawsuit.[12]

Nearly a year later, in July 2016, IDOC confiscated Mr. Guerrero's insoles during a cell-block "shakedown." PSOF IDOC ¶ 34. On August 2, 2016, Mr. Guerrero wrote to a nurse requesting a new pair of arch supports. Wexford DSOF ¶ 31. Shortly thereafter, on August 17, Mr. Guerrero saw Dr. Obaisi, who provided Mr. Guerrero with a new pair of gel insoles. *Id.* ¶ 32. One month later, on September 22, Mr. Guerrero spoke with a nurse about increasing pain in his feet. *Id.* ¶ 33. At this appointment, the nurse did not observe any swelling, bruising, or redness in his feet or ankles, but she prescribed acetaminophen and placed Mr. Guerrero on sick call. *Id.* As a result, on September 26, Mr. Guerrero saw P.A. Williams. Mr. Guerrero declined pain medication, saying he had had this pain his entire life. P.A. Williams instructed Guerrero to continue following her previous recommendations and referred him to Dr. Obaisi for re-evaluation. *Id.* ¶ 34. After two cancellations by Wexford, Mr. Guerrero saw Dr. Obaisi on October 31, 2016. *Id.* ¶¶ 35-37. Dr. Obaisi recommended that Mr. Guerrero go to a foot clinic and instructed him to return for a follow-up the next day. *Id.* ¶ 37. At the follow-up on December 1, Dr. Obaisi approved Mr. Guerrero's visit to the foot clinic and directed Mr. Guerrero to follow up with him as needed after the visit. *Id.* ¶ 38.

---

[12] The Court recruited counsel to represent Mr. Guerrero and an amended complaint was filed on February 22, 2016. The defendants' motion to dismiss the amended complaint was largely denied. ECF No. 88.

At some point after this appointment with Dr. Obaisi, Mr. Guerrero received treatment from a podiatrist at UIC. *Id.* ¶ 39. The UIC podiatrist did not prescribe any new medication or issue any new equipment, however, and Mr. Guerrero continued to use the gel insoles provided by Dr. Obaisi. *Id.*

Early the next year, on February 2, 2017, Mr. Guerrero again met with a nurse. At this appointment, Mr. Guerrero complained of soreness in his feet, though he didn't appear to be in distress or pain. *Id.* ¶ 40. The nurse prescribed a two-month supply of Tylenol 500 mg tablets. *Id.* Over a year later, on March 7, 2018, Mr. Guerrero was sent for treatment at another outside foot clinic, the Hanger Clinic, where he received new orthotic insoles called UCBLs. *Id.* ¶ 41.

## DISCUSSION

Summary judgment is appropriate only if the defendants show that there is "no genuine dispute as to any material fact and [that they are] entitled to judgment as a matter of law." *EEOC v. CVS Pharmacy, Inc.*, 809 F.3d 335, 339 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the Court construes "all facts and makes all reasonable inferences in favor of the non-moving party." *Jajeh v. County of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). Nonetheless, to show that a material fact is disputed, the party "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). In § 1983 cases, "the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *Padula v. Leimbach,* 656 F.3d 595, 600 (7th Cir. 2011).

The Eighth Amendment, as incorporated through the Fourteenth Amendment, requires prison officials to "provide inmates with medical care that is adequate in light of the severity of the condition and professional norms." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015). To state an Eighth Amendment claim against an individual under § 1983, Mr. Guerrero must show that "he suffered from (1) an objectively serious medical condition to which (2) a state official was deliberately indifferent, that is, subjectively, indifferent." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quotation marks and citation omitted).

As a threshold matter, the IDOC defendants dispute whether Mr. Guerrero's flat feet constituted an objectively serious medical condition.[13] An objectively serious medical condition is one that "has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013). A variety of factors can indicate a serious condition: that "the failure to treat a prisoner's condition could result in further significant injury," that the "medical condition [ ] significantly affects an individual's daily activities," or that the inmate is experiencing "chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). The Seventh Circuit has not assessed an instance of flat feet under the objectively serious standard, and in-circuit district courts presented with the issue have reserved judgment, instead finding the subjective element of deliberate indifference lacking. *See McCutcheon v. Sood*, No. 99 C 932, 2000 WL 528481, at *5 (N.D. Ill. Apr. 26, 2000); *Rogers v. Garnett*, No. CIV. 04-938-GPM, 2005 WL 2260869, at *3 (S.D. Ill. Sept. 16, 2005).

Some district courts in other circuits, however, have found instances of flat feet, and other similar ailments, to lack the requisite seriousness. In *Abney v. McGinnis*, for example, the District

---

[13] The Wexford defendants concede the point.

Court for the Southern District of New York concluded that plaintiff's medical condition, which included "hammer toes, bunions, collapsed arches, unerect heels, and laterally drifted big toes," was not serious. No. 01 CIV. 8444 (SAS), 2007 WL 844675, at *1-3 (S.D.N.Y. Mar. 16, 2007). The court reasoned that, "while painful," the condition was not "one of urgency that may produce death, degeneration, or extreme pain." *Id.* at *3 (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994);[14] *see also Brown v. Defrank*, No. 06 Civ. 2235, 2006 WL 3313821, at *21 (S.D.N.Y. Nov. 15, 2006) (bunions); *Hernandez v. Goord*, No. 02 Civ. 1704, 2006 WL 2109432, at *1, 5-6 (S.D.N.Y. July 28, 2006) (hammertoe); *Veloz v. New York*, 35 F. Supp. 2d 305, 312 (S.D.N.Y.1999) (fracture, bone cyst, and degenerative arthritis in toe); *but see Paul v. Bailey*, 2013 WL 2896990, *3 (S.D.N.Y. June 13, 2013) ("While Plaintiff's condition [flat feet] was not life-threatening, it can be appropriately described as chronic, and is sufficiently serious to constitute a serious medical need for the purposes of establishing an Eighth Amendment claim arising out of inadequate medical care."). Similarly, in *Johnson v. Medford*, the District Court for the Western District of North Carolina found, at the motion to dismiss stage, that neither "fallen arches" nor "flat feet" "suggest a serious medical condition." 208 F. Supp. 2d 590, 592 (W.D.N.C.), aff'd, 37 F. App'x 622 (4th Cir. 2002). These cases provide some support for the position that unextraordinary cases of flat feet—where, for example, the plaintiff is still able to exercise and perform other necessary activities—may not constitute an objectively serious medical condition. Nonetheless, the Court chooses to assume seriousness and proceed to the second element of the claim. *See Montano v. Wexford Health Sources, Inc.*, No. 14 C 2416, 2018 WL 741421, at *7 (N.D. Ill. Feb. 7, 2018) ("Thus, although there is a dispute about whether Montano is, in fact, suffering from a serious medical condition, the Court will assume he is for purposes of summary judgment and address only the second element of Montano's claim: deliberate indifference."). That the

---

[14] The court found it significant that the plaintiff did "not dispute that he played basketball, at least occasionally, and lifted weights while incarcerated." *Abney v. McGinnis*, No. 01 CIV. 8444 (SAS), 2007 WL 844675, at *3 (S.D.N.Y. Mar. 16, 2007).

seriousness of the condition of flat feet can be reasonably debated, however, informs evaluation of the reasonableness of the actions of the defendants in addressing Mr. Guerrero's complaints.

The "deliberate indifference" element of an Eighth Amendment claim requires "a sufficiently culpable state of mind" such that a prison official "knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). The standard differs for medical and non-medical prison officials. *See McGee*, 721 F.3d at 481 ("Claims of deliberate indifference to medical needs are examined differently depending on whether the defendants in question are medical professionals or lay persons.").

## I. Wexford Defendants

Although deliberate indifference is a subjective test, "[m]ost cases turn on circumstantial evidence, often originating in a doctor's failure to conform to basic standards of care." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc), as amended (Aug. 25, 2016). As a result, claims against medical professionals must overcome deference to medical expertise: "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)). Minimal competence has been found lacking where medical officials "provided [ ] 'blatantly inappropriate' treatment, ignored the recommendation of a specialist, or needlessly delayed [an inmate's] treatment (and thereby increased his pain)." *Stewart v. Wall*, 688 Fed. App'x 390, 392 (7th Cir. 2017) (quoting *Perez*, 792 F.3d at 777).

P.A. Williams—the only individual provider of medical care remaining in the case[15]—saw

---

[15] As noted *supra* note 1, the parties agree that Dr. Obaisi should be dismissed with prejudice. *See* Pl.'s Resp. Br. at 4 n. 1, ECF No. 139. Federal Rule of Civil Procedure 25(a)

Mr. Guerrero for his flat feet on three occasions: twice in February 2013 (for the initial visit and again for the x-ray results) and once in September 2016 (when she referred him to Dr. Obaisi). Mr. Guerrero takes issue with Williams' chosen course of treatment, but Williams' treatment decisions—ordering an x-ray, recommending shoes with good support and inserts/soles from the commissary, advising Mr. Guerrero to lose weight, and instructing him to return as needed—are the kind of reasonable choices "entitled to deference." *See Sain*, 512 F.3d at 894-95; *see also Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[Plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). This is particularly so given the fact that Mr. Guerrero did not follow P.A. Williams' instruction to return to the HCU as needed; his failure to do so, she could reasonably conclude, suggested that Guerrero's foot pain had been mitigated. Mr. Guerrero offers no basis to rebut the deference owed to P.A. Williams by providing expert testimony or any other evidence suggesting that her actions were objectively unreasonable. *See, e.g.*, *Whiting*, 839 F.3d at 663 (affirming grant of summary judgment on deliberate indifference claim where "no expert testified that [defendant's] chosen course of treatment was a substantial departure from accepted medical judgment, and the decision was not so obviously wrong that a layperson could draw the required inference about the doctor's state of mind without expert testimony"); *Arnett*, 658 F.3d at 759 ("Without some evidence, such as expert opinion testimony, creating a reasonable inference that [defendant's] treatment during this time frame was so inadequate that it

---

provides: "If a party dies, and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Here, Dr. Obaisi died in December 2017 and defendants served Mr. Guerrero with a Suggestion of Death by filing it on the docket on March 8, 2018, ECF No. 108. The parties agree that Mr. Guerrero did not make the requisite motion to substitute. Dismissal is therefore required.

demonstrated an absence of professional judgment, [plaintiff] cannot succeed against him on summary judgment.").

Certainly, the mere fact that the initial treatment decision did not solve Mr. Guerrero's problem is not indicative of indifference. As a preliminary matter, there is no evidence that Mr. Guerrero followed Williams' recommendation that he lose weight. Treatment that is not attempted cannot be effective, and on this record Williams bears no responsibility for that shortcoming. More fundamentally, the adequacy of treatment is evaluated *ex ante*, not *ex post*, and Mr. Guerrero presents no evidence that Williams knew changing shoes and/or adding insoles would not reduce his pain.[16] *See Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010) ("Even if a defendant recognizes the substantial risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994))). As a result, even if the course of treatment was a conservative one, Williams did not "resort to an easier course of treatment that [she] kn[ew] [was] ineffective." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).[17] Undoubtedly, the decision to pursue conservative care may be unreasonable where the risk of that treatment falling short is unacceptable compared to other available treatments. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (finding deliberate

---

[16] Although Mr. Guerrero informed Williams that he had previously used plastic inserts for his feet, there was no documentation of that treatment. Further, even if Williams had found evidence of previously prescribed insoles, she was entitled to make her own treatment decisions. *See Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir.2008) ("There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field.").

[17] The fact that Williams did not have up-to-date knowledge regarding the selection of shoes and/or insoles available at the commissary is, at most, indicative of negligence on her part—and it is well-established that negligence falls short of the culpability required for deliberate indifference. *See Doughty*, 433 F.3d at 1012-13 ("[I]n the context of medical professionals, it is important to emphasize that medical malpractice, negligence, or even gross negligence does not equate to deliberate indifference.").

indifference where a prison doctor "rejected the obvious alternative of referring [inmate] to a dentist"). This is not such a case. Although this opinion has assumed Mr. Guerrero's condition serious enough to require treatment of some sort, it was not dire—Mr. Guerrero had lived with the condition since childhood and P.A. Williams had no reason to believe that it was rapidly deteriorating; nor was Mr. Guerrero's condition debilitating at the time of treatment—although he was in pain, Mr. Guerrero could carry out normal activities (and even strenuous activities that put substantial stress on his feet, such as playing basketball and working in the prison kitchen). In other words, Mr. Guerrero's condition was a good candidate for the conservative treatment it received.

Similarly, Mr. Guerrero argues that Williams should have referred him to Dr. Obaisi more quickly—who could, in turn, have referred Mr. Guerrero to a specialist—but referral decisions are paradigmatic matters of "medical discretion."[18] *See Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) ("Like other medical decisions, the choice whether to refer a prisoner to a specialist involves the exercise of medical discretion, and so refusal to refer supports a claim of deliberate indifference only if that choice is blatantly inappropriate." (quotation marks and citation omitted)). As

---

[18] In addition to taking issue with the referral decision, Mr. Guerrero argues that P.A. Williams prevented Mr. Guerrero from seeing Dr. Obaisi in a broader sense. *See* Pl.'s Resp. Br. at 13-14 ("PA Williams did not permit Mr. Guerrero to see the Medical Director for more than a year from the time she originally learned of Mr. Guerrero's deformed feet and related pain…[She] delay[ed] Mr. Guerrero's ability to see the Medical Director for years at a time…"). That contention is without support. According to her testimony, Williams was the "first line" on sick call, but she was not a gatekeeper for Dr. Obaisi. *See* Williams Dep. 40:4-7, ECF No. 132-2. Outside of her own referral decisions, Williams played no role in determining which patients were treated by Dr. Obaisi. *See* Williams Dep. 40:12–41, ECF No. 132-2 ("[M]y lists are formulated in the medical records department. There is a particular individual that is responsible for putting together the lists for the providers on a daily basis."). Indeed, the dynamic described in Williams' deposition is clear in the facts of this case: when, for the first time since his February 2013 visits, Mr. Guerrero sought treatment through Wexford's sick call process, he was scheduled to see Dr. Obaisi, not P.A. Williams.

articulated above, the choice to first try non-specialist treatment options was reasonable—particularly in the context of an only borderline-serious condition—and therefore any delay caused by that decision was "tolerable," *see McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." (citations omitted)); certainly Guerrero has provided no basis on which to conclude that Williams' approach was inappropriate. *See, e.g.*, *Shead v. Purkett*, No. 4:07-CV-22 CEJ, 2009 WL 5220155, at *4 (E.D. Mo. Dec. 31, 2009) (granting summary judgment in absence of evidence that delay in obtaining orthotic footwear caused harm). Mr. Guerrero argues that he had to endure chronic pain, but the evidence demonstrates that he was offered pain relief medication and sometimes turned it down. Medical providers can hardly be faulted for not relieving pain when inmates decline medication.

Similarly, Mr. Guerrero makes much of the extended timeline of his treatment, but the bulk of the delay is properly attributed to him, not his medical providers. After P.A. Williams' initial treatment, she told Mr. Guerrero to "return as necessary" but he waited more than a year to do so; then he saw Dr. Obaisi, received insoles, and did not come back for two more years. Mr. Guerrero testified that he did not go back to the HCU because no one called him, but that does not support a claim for deliberate indifference. Although a *refusal* to provide recommended or requested follow-up care may support a finding of deliberate indifference, *see Arnett*, 658 F.3d at 753; *Gil v. Reed*, 381 F.3d 649, 663-64 (7th Cir. 2004), the decision not to *initiate* follow-up care after the provision of reasonable treatment simply does not indicate a "culpable state of mind." *Farmer*, 511 U.S. at 834. Medical officials have no duty to proactively check on inmates they believe have been adequately treated.

Mr. Guerrero also claims deliberate indifference on the part of Wexford itself. To prevail,

Mr. Guerrero must show that an official Wexford policy, practice, or custom caused a constitutional violation. *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) (stating that *Monell* liability "applies in § 1983 claims brought against private companies acting under color of state law"). Although the Court has found that Guerrero has no claim against P.A. Williams, Wexford may still be liable if its "institutional policies [were] themselves deliberately indifferent to the quality of care provided" and that deliberate indifference caused a constitutional violation. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) (en banc).

Here, Mr. Guerrero alleges an unconstitutional custom and practice of delaying treatment for prisoners and persisting in courses of treatment known to be ineffective. Mr. Guerrero's claim, however, fails at the threshold: he has not produced evidence sufficient to show that any Wexford employee caused him unconstitutional delay or prescribed him unconstitutional treatment. Without an underlying constitutional violation, no liability can flow to Wexford. *See Pyles*, 771 F.3d at 412 ("Wexford cannot be held liable for damages because there is no underlying constitutional violation."). If the policies Guerrero describes were Wexford policies, they were not followed in this case and therefore cannot be the cause of any harm to Mr. Guerrero.

As detailed above, on his three visits to P.A. Williams, Mr. Guerrero received objectively reasonable medical care and his other interactions with Wexford staff were consistent with this pattern. According to the undisputed record, Dr. Obaisi saw Mr. Guerrero for his flat feet on four occasions. During the first visit, in June 2014, Dr. Obaisi prescribed over-the-counter insoles with arch support. As with P.A. Williams, the treatment was more conservative than Mr. Guerrero desired, but there is no evidence that Dr. Obaisi knew it would be ineffective. Later, in August 2016, after Mr. Guerrero's first pair of insoles were confiscated, Dr. Obaisi provided a new pair per Mr. Guerrero's request. Next, Dr. Obaisi saw Mr. Guerrero on consecutive days in late 2016

and approved a visit to an outside specialist at UIC. Notably, the UIC specialist did not prescribe Mr. Guerrero any new treatment, which supports an inference that Dr. Obaisi's chosen course of care was reasonable. Even after referring him to the specialist, Dr. Obaisi advised Mr. Guerrero to return as needed. Addressing these two providers is sufficient to absolve Wexford of liability because no other employee played a substantial role in Mr. Guerrero's treatment: whenever Mr. Guerrero sought further treatment, he was eventually seen by either P.A. Williams or Dr. Obaisi, and each time they fulfilled his requests or reasonably modified his treatment to alleviate his ongoing problems.[19]

Although there were occasional delays due to Wexford cancellations, in light of the "overall treatment record," these "isolated instances" do not amount to a constitutional violation. *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997). As noted above, the most substantial delays in Mr. Guerrero's treatment were caused by his own inaction. First, after he visited P.A. Williams in February 2013, he did not seek medical care through the designated sick call process for roughly sixteen months. Next, after receiving arch support insoles in July 2014, Mr. Guerrero did not follow-up through the sick call process for over a year.[20] Finally, Mr. Guerrero offers no explanation for the fifteen months that elapsed between his authorization to see the UIC specialist and his trip to the Hangar Clinic, where he eventually received orthotics. Absent evidence that he lacked access to sick call,[21] a trier of fact could not infer that this gap was caused by any action on

---

[19] Soon after he was sent to the outside specialist, in February 2017, Mr. Guerrero visited a nurse complaining of soreness in his feet and was prescribed Tylenol. Mr. Guerrero does not claim that he requested a visit with P.A. Williams or Dr. Obaisi at that time.

[20] Mr. Guerrero did write a letter to Wexford in March 2015 and was instructed to follow the standard sick call process.

[21] Mr. Guerrero does not provide this evidence. He hints at this sort of situation in his deposition testimony but does not provide enough detail to support a finding. When asked, multiple times, if he could have signed up for sick call during the periods between his medical treatments, Mr. Guerrero pushed back each time: "You don't—it doesn't work that way;" "I'm in prison. I

Wexford's part.

Mr. Guerrero cannot establish that he suffered unconstitutional delay or ineffective treatment; it follows that Wexford's policies, practices, or customs could not have caused a constitutional violation. *See Pyles*, 771 F.3d at 412. As a result, Mr. Guerrero's § 1983 claim against Wexford fails.

## II.  IDOC Defendants

Mr. Guerrero also alleges deliberate indifference against various IDOC employees in their personal and official capacities.

### A. Personal-Capacity Claims

In certain circumstances, non-medical officials may be held liable in the absence of liability for medical officials. *See, e.g., Sanville v. McCaughtry*, 266 F.3d 724 (7th Cir. 2001) (affirming dismissal of claims against medical defendants but reversing dismissal of claims against prison guards where only the prison guards were aware of the risk of suicide). Here, however, Mr. Guerrero's argument frames the IDOC employees' liability as strictly derivative of the medical officials' liability: the IDOC employees are liable, he argues, because they failed to intervene when made aware of the unconstitutional course of treatment provided by the Wexford defendants. The above finding—that Mr. Guerrero received constitutionally adequate care—forecloses this avenue of liability. Nonetheless, the Court examines the claims against the IDOC defendants and finds, as an alternative ground for granting summary judgment, that they fail as a matter of law.

As to the remaining individual defendants, where medical personnel are entitled to deference, non-medical officials are entitled to defer. *See Arnett*, 658 F.3d at 755 ("Non-medical

---

don't get to have what I want;" "It doesn't work the way you think it works." *See* Guerrero Dep. 52:11–53:11, ECF No. 127-2.

defendants . . . can rely on the expertise of medical personnel."); *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) ("If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison." (quoting *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004))). Nonetheless, non-medical professionals "cannot simply ignore an inmate's plight." *Arnett*, 658 F.3d at 755. When non-medical professionals "have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner," they can be found liable for inaction. *Hayes*, 546 F.3d at 527. Given that mere negligence is insufficient for liability, however, there is no "ironclad rule that prisoner communication to a prison official anywhere in the corrections hierarchy constitutes adequate notice to the official of a violation of the Eighth Amendment." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). Rather, the plaintiff "has the burden of demonstrating that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'" *Id.* (quoting *Farmer*, 511 U.S. at 837).

Applying these principles to the present case, the IDOC defendants—Lemke, O'Brien, Brown-Reed, and Gomez—were not deliberately indifferent to Mr. Guerrero's medical condition.

### 1. Defendant Lemke, Warden, and Defendant O'Brien, Assistant Warden

The record indicates that defendants Lemke and O'Brien were made aware of Mr. Guerrero's complaints on, at most, two occasions. First, O'Brien and Lemke spoke with Mr. Guerrero during the October 2013 cell-house rounds they took with defendant Brown-Reed. During the conversation, Mr. Guerrero discussed his current course of treatment with the defendants and expressed dissatisfaction. Guerrero Dep. 106:7-12, ECF No. 127-2. This conversation did not put Lemke and O'Brien on notice of an excessive risk to health or safety: Mr.

Guerrero stated that he had received medical care—which, as discussed above, was not blatantly inappropriate (even if it was not the treatment he wanted)—and he did not claim to have requested or been refused alternative treatment in subsequent visits. *See Doughty*, 433 F.3d at 1011-12.

Even taken as true, Mr. Guerrero's disputed testimony that Lemke and O'Brien looked "shocked" by the condition of his feet, Def.'s Resp. PSOF IDOC ¶ 17, does not change the nature of the exchange. It is not an Eighth Amendment violation for an inmate to have a shocking medical issue—many appropriately treated conditions can be startling. Here, treatment was ongoing and available, and Lemke and O'Brien had no reason to question it. As a result, Mr. Guerrero's complaints provided the officials with personal knowledge of his medical condition—and may well have surprised them—but the complaints did not give the officials personal knowledge of an Eighth Amendment violation creating a duty to intervene. *See Doughty*, 433 F.3d at 1012 (quoting *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993)) ("A non-medical prison official . . . cannot be held 'deliberately indifferent simply because [he] failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.'").

O'Brien's (disputed) second interaction with Mr. Guerrero's various complaints came when her office responded to a letter from Mr. Guerrero. Even if O'Brien had personal knowledge of the events, which the defendants deny, Mr. Guerrero's letter did not give O'Brien reason to believe he was being mistreated by the medical officials. The letter prompting the response is not plausibly entered into evidence,[22] so the content must be inferred from the context and the response. The response, sent in December 2013, acknowledges Mr. Guerrero's stated need for orthopedic shoes and indicates review of Mr. Guerrero's medical chart. Even if Mr. Guerrero's letter expressed dissatisfaction with the course of treatment, because the medical treatment was

---

[22] *See supra* note 4.

not obviously inadequate, O'Brien cannot be deemed to have been objectively unreasonable in not taking further action. *Hayes*, 546 F.3d at 527.

In Lemke's case, his second (possible) exposure to Guerrero's dissatisfaction with Wexford's treatment of his foot condition came in relation to a grievance filed by Mr. Guerrero.[23] The grievance officer recommended "no action" on Mr. Guerrero's August 2013 grievance, citing the fact that Mr. Guerrero appeared to have received adequate medical care and had not sought treatment since February 2013. On October 21, 2013, Lemke or Lemke's designee concurred with the recommendation. Even assuming Lemke reviewed and signed the concurrence himself, his failure to intervene or investigate further in a case of facially adequate medical care does not approach deliberate indifference. *See Vance*, 97 F.3d at 993 (affirming grant of summary judgment for warden on claims of deliberate indifference where inmate sent warden a letter but did "not supply, in her description of the purported letter, any detail to permit the conclusion that the letter sufficiently advised the warden of the situation to require her intervention"). Permitting a factfinder to infer liability in such a case would severely strain the division of labor in the prison system and risk creating an "ironclad rule that prisoner communication to a prison official anywhere in the corrections hierarchy constitutes adequate notice to the official of a violation of the Eighth Amendment." *Id.*

The cases relied on by Mr. Guerrero are distinguishable. First, in *Reed v. McBride*, non-medical officials took no action in the face of plaintiff's complaints that he was being deprived of food and "medically-prescribed medicine." 178 F.3d 849, 853-854 (7th Cir. 1999). In Mr.

---

[23] Defendants argue that Lemke's designee was responsible for the review. If proven, this would prevent liability from attaching to Lemke because the subjective awareness required for deliberate indifference cannot be imputed to prison officials who delegate the review of grievances to designees. *See Thomas v. Knight*, 196 Fed. App. 424, 429 (7th Cir. 2006).

Guerrero's case, the prison officials deferred to ongoing medical treatment, but in *Reed* the defendants permitted noncompliance with medical orders. *Id.* Further, unlike the decision to pursue conservative treatment of flat feet, the deprivation of basic necessities—food and medication—presents a "sufficiently obvious" risk to require intervention. *Id*. Second, Mr. Guerrero cites *Perez v. Fenoglio*, a case in which an inmate was denied "medically necessary surgery for ten months" despite a "gaping wound" between his thumb and index finger. 792 F.3d at 774, 778. Again, the case differs both in the relationship to medical expertise and in the obviousness of the risk. In *Perez*, the plaintiff was prevented from receiving properly prescribed medical care: he had seen a specialist, but the local prison officials—both medical and non-medical—were not following the specialist's care instructions. *Id.* at 779. Likewise, a failure to stitch or repair a "gaping wound" for ten months carries risks that are substantially more obvious to the layperson than those posed by under-treated flat feet. In sum, *Reed* and *Perez* differ from the present circumstances in important respects and do not support a finding of liability here.

### 2. Defendant Brown-Reed, Health Care Unit Administrator

The story is much the same for defendant Brown-Reed. Brown-Reed had personal involvement with Mr. Guerrero's situation on two occasions. First, she conferred with the grievance officer about Mr. Guerrero's August 2013 complaint. At this point in time, Mr. Guerrero had been seen twice by P.A. Williams, had only recently followed through on her primary treatment recommendation to purchase shoes from the commissary, and had not requested a follow-up through the sick call process. Because Mr. Guerrero was not being denied treatment and the treatment was not obviously inadequate, Brown-Reed could reasonably rely on the expertise of the medical staff in conveying that Mr. Guerrero was currently receiving medical care. *See Johnson v. Shah*, No. 15-CV-344-SMY-RJD, 2018 WL 724427, at *7 (S.D. Ill. Feb. 6, 2018)

(finding a Health Care Unit Administrator "acted reasonably in relying on the decisions of Plaintiff's treatment providers" when she indicated to grievance officer that Plaintiff was receiving appropriate treatment). Brown-Reed's further involvement came during the October 2013 cell-house rounds she made with defendants O'Brien and Lemke. Per the discussion above relating to Lemke and O'Brien, this interaction did not put Brown-Reed on notice of excessive risk, especially given her prior knowledge of Mr. Guerrero's medical chart. *See Doughty*, 433 F.3d at 1012. The most one can say is that Brown-Reed did not go "beyond the requirements of her job and tr[y] to help [Mr. Guerrero]," but that does not constitute deliberate indifference. *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009).

### 3. Defendant Gomez, Deputy Director for the Northern District of the IDOC

Mr. Guerrero testifies to—and the defendants dispute—a single conversation between himself and Gomez as the basis for his deliberate indifference claim. As above, even assuming Mr. Guerrero's version of the disputed facts, the conversation was insufficient to put Gomez on notice of an excessive risk to Mr. Guerrero's health or safety. Importantly, while communicating his dissatisfaction with his treatment and the grievance process, Mr. Guerrero also communicated that he was receiving medical care. Like the other defendants, Gomez may have looked "shocked" by Mr. Guerrero's feet, Def.'s Resp. PSOF IDOC ¶ 32, but that does not mean he believed, or even that he had reason to believe, that Mr. Guerrero was being mistreated or that there was a clear risk to Mr. Guerrero's health. Unlike the lack of access to food and medicine in *Reed* or the unrepaired gaping wound in *Perez*, the possibility of under-treated flat feet does not communicate an excessive risk. Where a plaintiff has not clearly communicated such a risk, "[a] layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference." *Burks*, 555 F.3d at 595. The record does not indicate that Gomez followed-up on the conversation, but there is no

such obligation where there is no notice of an excessive risk of harm. *See Doughty*, 433 F.3d at 1011-12 (finding no deliberate indifference by a non-medical prison official who "took down [an inmate's] information and told [the inmate] that he would look into the situation and get back to [him], but . . . never did"). Gomez's failure to follow up may have reflected a lack of concern based on the information Guerrero provided, but it does not establish that he was indifferent to an Eighth Amendment violation.

### B. Official-Capacity Claims against IDOC Employees

Mr. Guerrero's remaining claims allege deliberate indifference against IDOC defendants in their official capacities, seeking injunctive relief. At the motion to dismiss stage, the Court dismissed the claim as to Gomez and O'Brien and substituted current office-holders Randy Pfister and John Baldwin for Lemke and Godinez respectively.

In general, official capacity claims operate as a suit against the government entity, and ultimately, the state. *Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2001) ("Official capacity suits are actions against the government entity of which the official is a part."). Nonetheless, neither the State's Eleventh Amendment sovereign immunity nor § 1983's restriction of suits to "persons" bars the claim for injunctive relief here: "a state official in his or her official capacity, when sued for injunctive relief, [is] [ ] a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, n. 10 (1989) (quoting *Kentucky v. Graham*, 473 U.S. 159, 167, n. 14 (1985)). These suits permit "relief requiring a state official to conform his or her behavior to the requirements of federal law in the future." *Hadi v. Horn*, 830 F.2d 779, 783 (7th Cir. 1987). Therefore, Mr. Guerrero's claims may be considered on the merits.

As with his claim against Wexford, to succeed here Mr. Guerrero must show that "the

entity's 'policy or custom' . . . played a part in the violation of federal law." *Graham*, 473 U.S. at 166. The Court, however, has found that Wexford's policies did not cause a violation of Mr. Guerrero's constitutional rights and it follows that IDOC cannot be derivatively liable. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[The City and its Police Commissioner] were sued only because they were thought legally responsible for [Officer] Bushey's actions; if the latter inflicted no constitutional injury on respondent, it is inconceivable that [the former] could be liable to respondent.").

Even absent that finding, however, the claims for injunctive relief are without merit. Although not addressed in the briefing, Mr. Guerrero's complaint alleges two policies as responsible for violating his constitutional rights. First, Mr. Guerrero argues that IDOC maintained an unlawful policy by condoning Wexford's allegedly unconstitutional policies. This claim is moot: since filing his complaint, Mr. Guerrero received all the care he sought for his foot condition. Although Mr. Guerrero requests injunctive relief beyond his own treatment—for example, "a reasonable and timely process for cancelling, skipping, and/or rescheduling appointments," *see* Am. Compl. Relief ¶ 1 ECF No. 31—his underlying condition is no longer an issue and therefore the remedy targets only "conjectural or hypothetical" future medical needs. *See Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)) (requiring a "'real and immediate' threat of future injury as opposed to a threat that is merely 'conjectural or hypothetical'"). As a result, "there is no longer an injury that can be redressed by a favorable decision." *Ostby v. Manhattan School Dist. No. 114*, 851 F.3d 677, 682 (7th Cir. 2017).[24]

---

[24] While there are exceptions to the mootness doctrine—for example, where injury is capable of repetition, yet evading review—Guerrero did not raise any of these exceptions in the response he filed. The Court therefore declines to consider whether any apply here.

Second, Mr. Guerrero argues that IDOC's failure to make the grievance process accessible to inmates who primarily speak Spanish constitutes deliberate indifference. Even if there were an underlying constitutional violation, Mr. Guerrero cannot plausibly establish that the violation resulted from this policy: he filed four grievances and clearly has a firm grasp on the language. Further, although the failure to provide an accessible grievance process can contribute to an Eighth Amendment violation, there is no independent right to a grievance procedure: "No prison is forced to have a grievance procedure. If it thinks that the costs of such a procedure outweigh the benefits, it can do without." *Ramirez v. Young*, 906 F.3d 530, 537 (7th Cir. 2018). Lack of access to Spanish-language grievances may have other legal consequences, but it is not, in itself, unlawful.[25]

* * * * *

Mr. Guerrero's case illustrates the substantial gap between deliberate medical care—which is permissible—and deliberately indifferent medical care—which is not. Mr. Guerrero's primary complaint is that he did not receive orthotic insoles for some time after he first sought them. Mr. Guerrero is entitled to adequate care, not to specific care, *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997), and the record demonstrates that Wexford and P.A. Williams provided adequate care over the entire period. Because Mr. Guerrero's formal and informal grievances communicated dissatisfaction but not an excessive risk to his health, the IDOC defendants cannot be held deliberately indifferent. The defendants' motions for summary

---

[25] In *Ramirez v. Young*, the Seventh Circuit held that, for the purposes of administrative exhaustion under the Prison Litigation Reform Act, grievance procedures are "unavailable" when they are provided only in a language that the inmate cannot understand. 906 F.3d 530, 537 (7th Cir. 2018).

judgment are granted.[26]

Dated: February 13, 2020

John J. Tharp, Jr.
United States District Judge

---

[26] The Court thanks recruited counsel for the plaintiff, Kevin Finger and Michael Baier, of Greenburg Traurig, LLP, who have ably represented the plaintiff throughout this case.